# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | |
|---|---|
| CYNTHIA FLEMING CHESNUT, | ) |
| Plaintiff, | ) ) ) |
| v. | ) CIVIL ACTION NO. 5:18-CV-404 (MTT) ) |
| CC SERVICES, INC., | ) ) ) |
| Defendant. | ) ) |

## ORDER

Plaintiff Cynthia Fleming Chesnut has, for the second time, moved for reconsideration of the Court's Order dismissing her failure to accommodate claim because she failed to exhaust her administrative remedies. Doc. 60. This time, she seeks reconsideration because she has now obtained from the EEOC handwritten notes made by an EEOC intake officer while interviewing Chesnut. *Id.* In these notes, the EEOC intake officer acknowledges Chesnut's claim that Defendant CC Services, Inc. ("CCS") had failed to accommodate her disability. Doc. 60-3 at 4−5. The officer specifically noted that Chesnut "had no accommodation at time of discharge." *Id.* at 5. For the following reasons, Chestnut's motion (Doc. 60) is **GRANTED**.[1]

### I. BACKGROUND

Given the substance of the intake officer's notes, it is important at the outset to make clear just what Chestnut's failure to accommodate claim is about. In Count 1 of

---

[1] Chesnut also moved the Court to grant her leave to amend her amended complaint "[i]f the Court finds that this newly-discovered evidence supports the allegation that she administratively exhausted." Doc. 60 at 5. Given this order, that motion is **DENIED as moot**.

her Complaint, she alleges that because of CCS's repeated failure to provide her with an accommodation, she "struggled in her position and did not meet certain performance and productivity standards, which resulted in her termination in November 2017." Doc. 24 ¶ 64. In Count 2, she alleges that she was terminated because of her disability. *Id.* ¶¶ 66−74. Thus, Counts 1 and 2 seek relief for the same action—her termination—but each count alleges a different basis for granting relief.

On January 11, 2018, Chesnut submitted an online Inquiry Information form to the Equal Employment Opportunity Commission. Doc. 31-1 at 22−23. In that form, she wrote that CCS terminated her

> because [she] did not meet Minimum Performance Standards. Since witnessing [her] husband taking his life September 3rd 2015 [Chesnut] began having difficulty performing [her] job immediately following his death. While an employee of the Company [she] was diagnosed with Complex Grief disorder and [post-traumatic stress disorder].

Doc. 60-3 at 8.

Sometime between submitting her online Inquiry Information form and filing a verified charge of discrimination, Chesnut spoke with the EEOC intake officer whose notes are now in the record. The notes state, among other things, that Chesnut told the intake officer that CCS was aware as early as 2016 that Chesnut had been diagnosed with complex grief disorder and PTSD; that she "asked [CCS] for [an] accommodation[;]" that her supervisor, Mike Sehringer, denied her request; and that she "had no accommodation at [the] time of discharge" in 2017. *Id.* at 4−5.

On January 24, Chesnut, acting without an attorney, filed her verified charge alleging that the discrimination occurred on November 15, 2017, the date of her discharge. Doc. 30-1. She alleged the following particulars:

> I began my employment with [CCS] as an Insurance Financial Representative on October 15, 2013. Management and Human Resources was informed of disabilities in December of 2015 and January of 2016. On November 15, 2017, I was informed of my discharge by my supervisor, Mike Sehringer.
>
> The reason given for my discharge was not meeting performance standards.
>
> I believe that I have been discriminated against because of my disabilities, in violation of Title I of the Americans with Disabilities Act of 1990, as amended.

*Id.*

On October 29, Chesnut, still proceeding *pro se*, brought suit against CCS alleging that it failed to offer her a "reasonable accommodation," her job performance suffered, and she was terminated. Doc. 1 at 3, 5. After retaining counsel, Chesnut alleged in an amended complaint that CCS (1) failed to accommodate her disability in violation of the Americans with Disabilities Act; (2) terminated her because of her disability in violation of the ADA; (3) failed to pay her minimum wage; and (4) failed to pay overtime. Doc. 24 ¶¶ 54−89.

CCS moved to dismiss Chesnut's failure-to-accommodate claim for failure to exhaust. Docs. 28. In response, Chesnut offered no evidence other than her EEOC charge and an email to the EEOC, but she argued in her brief:

> Ms. Chesnut will testify that she informed the EEOC of Defendant's denial of her request for a reasonable accommodation. Specifically, Ms. Chesnut raised this issue during her initial meeting with the intake officer, and it was also something that she discussed with EEOC Senior Investigator, April Shippy. In fact, both the intake officer and the Senior Investigator told Ms. Chesnut that she would have the opportunity to provide more information about Defendant's failure to provide her with a reasonable accommodation.

Doc. 30 at 7.

In its reply, CCS attached a redacted copy of Chesnut's EEOC file that it obtained through a Freedom of Information Act request and noted that nothing in the file suggested that Chesnut had ever alleged CCS failed to accommodate her disability. Docs. 31-1; 31-2; 31-3; 31-4; 31-5; 31-6. The redacted EEOC file produced by CCS did not contain the EEOC intake officer's notes.

The Court granted CCS's motion on September 12, 2019. Doc. 45. Chesnut moved the Court to reconsider on September 25. Doc. 47. Chesnut argued that the Court made a clear error of law because her "Charge and Complaint both contain the same allegation of disability discrimination based on a failure to provide a reasonable accommodation[;]" that the allegations in her charge are reasonably related to the allegations in her Complaint; and that "a reasonable EEOC investigator should have known to investigate the issue of a reasonable accommodation." Doc. 47 at 1, 5. The Court denied that motion. Doc. 49.

On September 19, after the Court had granted CCS's motion to dismiss and before Chesnut filed her first motion to reconsider, Chesnut subpoenaed the EEOC to produce (1) her complete, unredacted file; (2) any written correspondence between her and the EEOC; (3) any written correspondence between CCS and the EEOC; (4) all intake and inquiry documents made by Chesnut and EEOC representatives; (5) recordings of any communications between Chesnut and EEOC representatives; and (6) a blank copy of the most recent version of any standard documents "intended for EEOC intake and/or investigation personnel to use to gather information about a claim brought under the [ADA]." Doc. 56-1. Chesnut requested that the EEOC respond by October 29. Doc. 56-2. On September 30, the EEOC, treating Chesnut's subpoena as a FOIA request, partially granted the request. Docs. 56-2; 56-3. The EEOC explained

that some information, including an EEOC intake officer's notes regarding a telephone conversation with Chesnut, was withheld pursuant to 5 U.S.C. § 552(b)(5)[2] because that information is "pre-decisional and deliberative and reflects the investigator's analysis." Doc. 56-3. Chesnut states in her brief that she "attempted to contact the FOIA Liaison via telephone to inquire as to the requested documents that the EEOC failed to provide" multiple times. Doc. 56 at 3. Assuming that the EEOC would follow up with its September 30 response by October 29, Chesnut waited until November 1 to move to compel the EEOC to produce the documents. *Id.* at 3−4; *see* Doc. 60-3 at 1.

On November 13, the EEOC produced more documents from Chesnut's file, including the EEOC intake officer's unredacted, handwritten notes taken during Chesnut's intake meeting.[3] Doc. 60-3 at 2, 4−5. Chesnut then filed her second motion for reconsideration. Doc. 60.

## II. MOTION FOR RECONSIDERATION STANDARD

Pursuant to Local Rule 7.6, "Motions for Reconsideration shall not be filed as a matter of routine practice."[4] "Reconsideration is appropriate only if the movant demonstrates (1) that there has been an intervening change in the law, (2) that new evidence has been discovered which was not previously available to the parties in the exercise of due diligence, or (3) that the court made a clear error of law." *Bingham v.*

---

[2] Section 552(b)(5) provides an exception to FOIA requests that involve "inter-agency or intra-agency memorandums or letters that would be available by law to a party other than an agency in litigation with the agency. . . ."

[3] Because the EEOC produced the documents Chesnut requested before the Court ruled on the motion to compel (Doc. 56), Chesnut moved to withdraw that motion (Doc. 57), and the Court granted the motion to withdraw, thus terminating the motion to compel. Doc. 58.

[4] Local Rule 7.6 also states that parties "shall not file motions to reconsider the court's denial or grant of a prior motion for reconsideration." However, because no party addressed this Rule, the Court will consider Chesnut's second motion. *See generally* Docs. 60; 65.

*Nelson*, 2010 WL 339806, at *1 (M.D. Ga. Jan. 21, 2010) (quotation marks and citation omitted).

### III. STANDARD OF REVIEW FOR FAILURE TO EXHAUST

Much of the confusion and most of the delay here arguably arise from a failure to appreciate the difference between a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss and a motion alleging a failure to exhaust administrative remedies. For example, Chesnut thought her bare allegation of exhaustion was sufficient to create a fact issue, she complained about the Court going outside the pleadings without converting CCS' motion to dismiss to a summary judgment motion, and she argued in her briefs facts that were not in the record. Doc. 30 at 7−8. Chesnut is not alone in this regard. Courts also frequently struggle to resolve EEOC exhaustion issues within the framework for Rule 12(b)(6) motions and motions for summary judgment. So it is appropriate to make clear the correct standard.

Plaintiffs proceeding under the ADA must exhaust their administrative remedies by filing a charge with the EEOC before bringing their claims in federal court. *See* 42 U.S.C. § 12117(a) (incorporating 42 U.S.C. § 2000e-5); *Duble v. FedEx Ground Package Sys., Inc.*, 572 Fed. App'x 889, 892 (11th Cir. 2014) (applying the Title VII exhaustion requirement to an ADA claim) (citations omitted). The defense of failure to exhaust non-judicial remedies raises a matter in abatement. *Bryant v. Rich*, 530 F.3d 1368, 1374−75 (11th Cir. 2008) (citations omitted). As in the case of other matters in abatement, *e.g.* jurisdiction, venue, and service of process, a district court may— indeed, necessarily must—consider facts outside the pleadings and resolve factual disputes to determine whether an exhaustion defense has merit "so long as the factual disputes do not decide the merits and the parties have sufficient opportunity to develop

a record." *Id.* at 1376 (citations omitted).  See also, *e.g.*, *Snow v. Cirrus Educ. Grp.*, No. 5:17-CV-208, 2017 WL 6001502, at *3 (M.D. Ga. Dec. 4, 2017); *Akkasha v. Bloomingdale's, Inc.*, 2019 WL 7480652, at *3 (S.D. Fla. Dec. 18, 2019) (on appeal). Plaintiffs who allege disability discrimination by their employers bear "the burden of proving all conditions precedent to filing suit. . . ." *Maynard v. Pneumatic Prods. Corp.*, 256 F.3d 1259, 1262 (11th Cir. 2001). Thus, Chesnut must prove that she exhausted her failure-to-accommodate claim.

## IV.  DISCUSSION

In her second motion for reconsideration, Chesnut forthrightly acknowledges her failure to put in the record any evidence suggesting that she had exhausted her failure to accommodate claim. Doc. 60 at 4. But she says she now has that evidence, albeit after considerable squabbling with the EEOC. Based on the intake officer's notes, she argues, in relevant part, her "failure to accommodate claim was not a new act of discrimination, but, rather, was certainly presented to the EEOC and reasonably related to her Charge." Doc. 60 at 4.

CCS argues that the Court should deny Chesnut's second motion for reconsideration because (1) she is making an old argument "with evidence that could have been presented earlier[;]" (2) the intake officer's handwritten notes are "legally irrelevant[;]" (3) Chesnut should have known to use "the magic word 'accommodation'" based on her prior experience in filing a charge with the EEOC; (4) CCS would be unfairly prejudiced if the Court granted her motion; (5) "the EEOC properly conducted its investigation based on Plaintiff's subsequently filed charge[;]" and (6) Chesnut failed to respond to CCS's position statement that did not address a failure to accommodate. Doc. 65.

In the Court's view, the EEOC officer's intake notes primarily raise two issues: whether the notes merit reconsideration; and, if so, whether Chesnut has exercised appropriate diligence in presenting this evidence to the Court.

**A. The Intake Officer's Notes Merit Reconsideration**

As litigants and the courts immerse themselves in the intricacies of EEOC exhaustion analysis, we sometimes overlook the reason Congress required claimants to first present their grievances to the EEOC. On the facts here, it is particularly important to start with Congress' rationale for exhaustion.

> The purpose of this exhaustion requirement "is that the [EEOC] should have the first opportunity to investigate the alleged discriminatory practices to permit it to perform its role in obtaining voluntary compliance and promoting conciliation efforts." *Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 929 (11th Cir.1983); *see also Wu v. Thomas*, 863 F.2d 1543, 1548 (11th Cir.1989) ("The purpose of the filing requirement is to insure that the settlement of grievances be first attempted through the office of the EEOC.") (internal quotation and citation omitted).

*Gregory v. Ga. Dep't of Human Res.*, 355 F.3d 1277, 1279 (11th Cir. 2004) (alterations in original). When determining whether that purpose has been served, the Eleventh Circuit has taken a practical, substance-over-form approach. *See, e.g., id.*; *Batson v. Salvation Army*, 897 F.3d 1320 (11th Cir. 2018). Thus, the scope of an EEOC charge should not be "strictly interpreted." *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 465 (5th Cir. 1970).[5] And, rarely should "procedural technicalities" bar ADA claims. *See id.* at 460−61.

Thus, in *Gregory v. Georgia Department of Human Resources*, the Circuit made clear that "judicial claims are allowed if they "'amplify, clarify, or more clearly focus' the

---

[5] The Eleventh Circuit has adopted as binding precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

allegations in the EEOC complaint, [although] allegations of *new acts of discrimination are inappropriate.*" 355 F.3d at 1279−80 (*quoting Wu*, 863 F.2d at 1547 (citation omitted)) (emphasis added). Gregory's EEOC charge claimed she had been terminated because of her race and sex. *Id.* at 1279. She did not check the retaliation box on the EEOC charge form and did not mention retaliation in her charge. *Id.* But when she filed suit, she alleged that her termination "was motivated by her race and/or in retaliation" for her complaints about race discrimination. *Id.* The Eleventh Circuit held that Gregory had exhausted her retaliation claim because the claims "alleged in her EEOC charge could have reasonably been extended to encompass a claim for retaliation because they were inextricably intertwined with her complaints of race and sex discrimination." *Id.* at 1280. Specifically, she alleged in her lawsuit she had been subjected to discriminatory acts, she complained about those acts, and shortly thereafter she was fired. *Id.* Given these facts, an "EEOC investigation of her race and sex discrimination complaints leading to her termination would have reasonably uncovered any evidence of retaliation." *Id.* (citation omitted).

*Batson v. Salvation Army*, the Circuit's latest reported decision on this precise exhaustion issue, is particularly instructive. Batson alleged in her EEOC charge only a failure to accommodate her disability and claimed that failure to accommodate led to her termination.[6] *Batson*, 897 F.3d at 1325. She neither checked the retaliation box in the

---

[6] Specifically, she stated:

> I. I began employment with the above employer in 2002. I last worked as an Audit Manager. On February 22, 2013, I request a reasonable accommodation related to my medical condition. My requested accommodation was denied.
>
> II. No reason was given for the denial of a reasonable accommodation.

Batson v. Salvation Army, Dkt. No. 3:14-cv-31-TCB, Doc. 64-4 at 2.

charge form nor alleged retaliation in the substance of her charge. *Id.* In her lawsuit, she alleged her termination was also in retaliation for requesting an accommodation. *Id.* at 1326. The district court dismissed the retaliation claim for failure to exhaust. *Id.* at 1325. The Eleventh Circuit reversed, stating that

> In the Charge, Batson stated that she believed she suffered discrimination because of her disability, that she had requested an accommodation in February 2013, and that her request was denied. The Charge also listed Batson's termination date as the last day on which discrimination had taken place. . . . [T]he information included in the Charge was thus sufficiently 'related to' Batson's retaliation claim to satisfy the exhaustion requirement.

*Id.* at 1328 (citations omitted). Because the accommodation request led to the alleged retaliation, and her termination was the "form" of the alleged retaliation, "an EEOC investigation of Batson's failure to accommodate claim would have 'at least in some fashion' uncovered Batson's retaliation claim." *Id.* (citations omitted).

The Court reaches the same conclusion here. Indeed, with Chesnut's new evidence, the conclusion that she exhausted claims arising from her termination is even more compelling than in *Gregory* and *Batson*. Again, it is important to remember what Chesnut's failure-to-accommodate claim is. Although she pleads in her Complaint several specific failures to accommodate her disability in the months before her termination, she does not seek relief for those discrete acts. Her charge and her Complaint are both clear—she seeks relief only for her November 15 termination. Specifically, she alleges that because of CCS's repeated failure to provide her with an accommodation, she "struggled in her position and did not meet certain performance and productivity standards, which resulted in her termination in November 2017." Doc. 24 ¶ 64. Thus, while Chesnut alleges she was terminated because of her disability, she also alleges that her failure to meet CCS's performance standards—which likely is to be

- 10 -

CCS's legitimate, nondiscriminatory reason for her termination—was a consequence of CCS's refusal to accommodate her disability. Whether her claims are viable remains to be seen. But the relevant point now is that her failure-to-accommodate claim is not a separate claim—it is a separate basis for granting relief. Like the retaliation claims in *Gregory* and *Batson,* it is a vehicle to recover for the discriminatory act she alleged in her EEOC charge—her termination.[7]

Chesnut, without the assistance of counsel, essentially alleged the same thing in her EEOC charge. She stated that CCS was aware of her disabilities and that she failed to meet CCS's performance standards, which was the basis for her termination, and that CCS terminated her because of her disability. Doc. 31-1 at 14. In other words, her termination was the "form" CCS's failure to accommodate took, like Gregory's and Batson's terminations were the "forms" their employers' retaliation took. Any doubt over what Chesnut was telling the EEOC vanishes when the intake officer's notes are considered.[8] She told the officer about CCS's repeated failure to accommodate and that there was "no accommodation at time of discharge." Doc. 60-3 at 5. As in *Gregory*, actually, even more so, "[t]he facts alleged in [Chesnut's] EEOC charge could have reasonably been extended to encompass a claim for [failure to accommodate] because they were inextricably intertwined with her complaints of [disability] discrimination." 355 F.3d at 1280. And as in *Batson,* CCS's alleged denial of her

---

[7] Chesnut does allege that on occasion her pay was docked because she failed to meet certain benchmarks, but it is clear that the docking of pay is the basis for her Fair Labor Standards Act claim alleged in Count 3 of her Complaint. Count 1 makes no mention of pay docking.

[8] The Court is not holding that the officer's notes are a charge, which is why it is not necessary to address this part of CCS's argument. *See* Doc. 65 at 2. Again, Chesnut is not alleging a new act of discrimination, but rather more thoroughly alleging what was already in her charge. *Compare* Doc. 30-1 *with* Doc. 24. However, the notes support the fact that the EEOC knew exactly what Chesnut was alleging and what needed to be investigated as part of her charge, which is the purpose of the exhaustion requirement. *Compare* Doc. 60-3 at 8 *with* Doc. 30-1.

accommodation request prevented her from meeting performance standards, and because Chesnut's "termination, mentioned in the Charge, was the specific form the [discrimination] took[,] … an EEOC investigation of [Chesnut's termination] would have 'at least in some fashion' uncovered" Chesnut's claim that CCS's failure to accommodate led to her discharge. 897 F.3d at 1328. For that matter, no investigation was required to uncover her claims; she spelled them out for the EEOC. Finally, unlike *Gregory* and *Batson,* there is no failure-to-accommodate box on the EEOC charge form for Chesnut to have checked. *Compare* Doc. 30-1 *with Batson*, 897 F.3d at 1325; *Gregory*, 355 F.3d at 1279. It is difficult to see what more Chesnut could have done.

In sum, Chesnut in her EEOC charge claimed, and her amended complaint now claims, that her termination was discriminatory. Her charge gave the EEOC the first opportunity to investigate the discriminatory practices that led to her termination. Therefore, she exhausted her administrative remedies for claims arising from her termination, including her claim that CCS's failure to accommodate her disability was the reason for her termination.

**B. Chesnut Exercised Due Diligence**

Chesnut contends that she "diligently" sought the EEOC intake officer's handwritten notes and has just recently obtained them. Docs. 60 at 4; 60-1; 60-2; 60-3. CCS responds that Chesnut waited to serve "the EEOC with a subpoena … after the Court had already granted Defendant's Motion to Dismiss." Doc. 65 at 1 (citing Docs. 45 (order granting motion to partially dismiss); 60-2 (Chesnut's subpoena to the EEOC)). While Chesnut can be faulted for some delay in obtaining the intake officer's notes, once the significance of those notes became clear, she acted promptly—within a

week—to force the EEOC to produce those notes before filing her motion for reconsideration.[9] The Court concludes Chesnut exercised sufficient diligence.

## C. The Court Clearly Erred

Finally, the intake officer's notes and the Court's review of earlier briefing, particularly Chesnut's argument in support of her first motion for reconsideration, lead the Court to conclude that it committed legal error when it denied Chesnut's first motion for reconsideration. In response to that motion, Chesnut argued that her "ultimate allegation in Count I is that Defendant discriminated against her by terminating her in November 2017 without first providing, or even considering, a reasonable accommodation." Doc. 47 at 3. This, she argued then, was "the same allegation in her EEOC charge of discrimination." *Id.* This, of course, is the conclusion the Court has now reached. Although the intake officer's notes made it easier to reach this conclusion, the Court acknowledges it should have granted Chesnut's first motion for reconsideration.

## D. Any Possible Pressure to CCS Is Not Relevant; CCS Will Not Be Prejudiced

CCS argues that it did not address Chesnut's failure-to-accommodate claim in its position statement because it was not on notice of the allegation and thus will be prejudiced if Chesnut is allowed to bring her claim now. Doc. 65 at 2−3. That argument is patently without merit. First, CCS does not specify how it was prejudiced and cites no law supporting this argument. Although one of the charge's "functions" is to provide

---

[9] Local Rule 7.6 requires motions for reconsideration to be filed within fourteen days after the entry of an order, making it nearly impossible for Chesnut to have obtained the notes before filing her first motion for reconsideration. Because Chesnut's first motion was based on the argument that the Court clearly erred—not on the basis of new evidence—the fourteen-day deadline from the time the first order was issued applied. On the other hand, Chesnut received the new evidence from the EEOC on November 13 and filed her second motion to reconsider on December 13. This is clearly outside the fourteen-day window imposed by Local Rule 7.6. But because CCS did not argue that this motion was submitted outside that window and because, as soon discussed, the Court clearly erred, the Court will not fault Chesnut for the untimely motion.

notice to the employer, *Wikerson v. Grinnell Corp.*, 270 F.3d 1314, 1319 (11th Cir. 2001) (citation omitted), the overall "purpose" of the exhaustion requirement "is that the EEOC should have the first opportunity to investigate the alleged discriminatory practices[,]" *Gregory*, 355 F.3d at 1280 (quotation marks, alterations, and citations omitted). The purpose of exhaustion is not to avoid prejudice to the employer, and, as previously discussed, the EEOC investigation should have, "at least in some fashion," uncovered her failure-to-accommodate claim. Thus, the Court will not deny Chesnut's motion based on this alleged—but unspecified—prejudice to CCS.

Second, CCS will not be prejudiced. Contrary to its assertion, it did, in fact, address in its position statement the very facts relevant to Chesnut's failure-to-accommodate allegations. In the statement, CCS stated that in December 2015, it received a letter from Chesnut's doctor supporting her leave-of-absence request "due to anxiety and stress. . . . Other than this leave of absence, [Chesnut] never requested any additional leave of absence or other *accommodation*. As far as [CCS] was aware, [Chesnut] returned from an approved leave of absence with no work restrictions or any other indication that she had a disability[,]" and that it terminated her when she "fail[ed] to reach benchmarks." Doc. 31-1 at 10 (emphasis added). CCS was clearly addressing exactly what Chesnut was alleging in her charge and what she has more clearly alleged in her Complaint: that her termination by CCS was the result of her lack of meeting CCS's performance standards, which was due to CCS's failure to accommodate her.

## IV. CONCLUSION

For the foregoing reasons, Chesnut's second motion for reconsideration (Doc. 60) is **GRANTED**, and her motion to amend (Doc. 60) is **DENIED as moot**. Upon

reconsideration, CCS's motion to dismiss Count I of Chesnut's Amended Complaint is denied.

**SO ORDERED**, this 24th day of March, 2020.

S/ Marc T. Treadwell  
MARC T. TREADWELL, JUDGE  
UNITED STATES DISTRICT COURT